|  |  |  |
|---|---|---|
| BENEDORTSE, LLC, | ) | Case No.: |
|  | ) |  |
|   Plaintiff, | ) | Judge: |
|  | ) |  |
| v. | ) | Magistrate Judge: |
|  | ) |  |
| GOOGLE LLC, | ) | **JURY DEMAND** |
|  | ) |  |
|   Defendant. | ) |  |
|  | ) |  |
|  | ) |  |
|  | ) |  |

## COMPLAINT FOR PATENT INFRINGEMENT

### I.      INTRODUCTION

1.     Plaintiff BenedorTSE, LLC ("Benedor") brings this action for patent infringement against Defendant Google LLC ("Google"), arising from Google's unauthorized use of Benedor's patented technology for secure electronic transactions. Google's mobile payment service, Google Pay / Google Wallet, in conjunction with its supporting hardware (e.g., Google Pixel smartphones and Pixel Watch, and Android-based smartphones running the Google Wallet application) and computer systems (including Google's tokenization and payment-authorization infrastructure), infringes U.S. Patent Nos. 8,463,713, 9,400,979, and 8,260,723 (the "Patents-in-Suit"), at least by practicing the patented methods for generating and transmitting encrypted user and device identifiers to authorize transactions. Benedor seeks damages for past infringement, a declaratory judgment of infringement and validity, enhanced damages for willful infringement, and its attorneys' fees and costs.

#### A.     The Parties

2.     Plaintiff BenedorTSE, LLC is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in Franklin, TN.

3. Defendant Google LLC is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, California 94043. Google conducts substantial and continuous business throughout the United States, including within this judicial district, by owning and operating a data center at 1000 Boolean Drive, Clarksville, Tennessee 37040, and by providing products and services, including the accused Google Pay / Google Wallet service and the Pixel line of smartphones, to residents of Tennessee.

### B. Jurisdiction and Venue

4. This is an action for patent infringement arising under the patent laws of the United States, Title 35 of the United States Code.

5. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

6. This Court has personal jurisdiction over Google because it has committed acts of patent infringement in this judicial district, has conducted and does conduct continuous and systematic business in this district, and has purposefully availed itself of the privileges of conducting business in the State of Tennessee, including by owning and operating a regular and established physical data center located at 1000 Boolean Drive, Clarksville, Tennessee 37040, and by offering and providing the accused infringing products and services to residents of this district.

7. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1400(b) because Google has committed acts of infringement in this district and has a regular and established place of business in this district. Specifically, Google owns and operates an approximately $600 million data center at 1000 Boolean Drive, Clarksville, Tennessee 37040, which is located in Montgomery County, Tennessee, within the Nashville Division of the Middle District of

Tennessee. Google broke ground on the Clarksville data center in February 2018 and publicly opened the facility on November 6, 2022 in a ribbon-cutting ceremony attended by Tennessee Governor Bill Lee. The Clarksville data center is a permanent, physical place of Google's business, is staffed by Google personnel, and is held out to the public by Google as a Google facility.

## II.     FACTUAL BACKGROUND

### A.     State of the Art Prior to the Benedor Inventions

8.      Prior to December 1, 2000, the growth of electronic commerce was hampered by the lack of convenient and secure payment systems. Most online transactions relied on "single-factor" authentication, typically a username and password, which was widely recognized as an insufficient security measure against theft and fraud.

9.      Prior to December 1, 2000, a common method for securing data in transit was the Secure Sockets Layer (SSL) protocol. However, SSL only encrypted the communication channel between a customer and a merchant. Once the data arrived at the merchant's server, it was commonly decrypted, exposing the customer's sensitive personal and financial information, such as full credit card numbers, to the merchant and leaving it vulnerable in the merchant's database.

10.      Advanced but commercially unsuccessful protocols like Secure Electronic Transaction (SET) were developed to prevent merchants from seeing customer credit card numbers. SET required a complex infrastructure, including digital certificates for consumers, and was ultimately considered too cumbersome for widespread adoption, leaving a need for a more practical solution.

11.      While multi-factor authentication (MFA) was a known security concept, its use in consumer e-commerce was not conventional or widespread. Existing MFA solutions were generally limited to niche, high-security enterprise or banking environments.

12. Using a customer's own computer or mobile device as an authentication factor by automatically reading a unique hardware identifier, such as a serial number, was not a routine or conventional practice. The concept faced significant privacy concerns and had not been implemented in any widely deployed system. Conventional systems did not treat the user's personal computing device itself as a security token.

13. In the then-prevailing e-commerce model, the customer's device did not typically encrypt user data or perform cryptographic security functions beyond the browser's handling of an SSL connection. The practice of having the client device itself combine multiple pieces of information and then mathematically scramble them into a single-use, secure code for that single transaction, thereby combining multiple authentication factors for verification by a trusted third party, was not a conventional or routine part of an online transaction.

14. As of December 1, 2000, a technological gap existed for a secure, practical, and convenient system for online transactions. No conventional or widely adopted technology existed that could: (a) protect a customer's sensitive information from the merchant; (b) link a user's identity to their specific physical device in a secure and automated way; and (c) generate a unique, encrypted, single-use credential on the user's device to provide strong, "person-present" verification for the transaction.

### B. The Plaintiff and the Benedor Inventions

15. Richard F. Carrott was the founder of Benedor and invented the technology underlying the Patents-in-Suit. In the early 2000s, Mr. Carrott sought to address the security risks inherent in online transactions.

16. Mr. Carrott conceived of and developed a novel system that avoided the transmission of sensitive personal information while still enabling robust, positive verification of both the user and their device. This patented system securely links a user's account to their

specific device, generates secure encrypted identifiers, and facilitates network-based transaction authorization without exposing confidential data.

17.     Mr. Carrott filed U.S. Application No. 09/726,304 on December 1, 2000 (the "Original Application"). All of the Patents-in-Suit claim priority to the Original Application, and the claimed inventions of the Patents-in-Suit are entitled to the priority date of the Original Application.

### C.     The Patents-in-Suit

18.     On June 11, 2013, the United States Patent and Trademark Office ("USPTO") duly and legally issued U.S. Patent No. 8,463,713 ("the '713 Patent"), entitled *Transactional Security Over a Network*. A true and correct copy of the '713 Patent is attached as Exhibit A.

19.     On July 26, 2016, the USPTO duly and legally issued U.S. Patent No. 9,400,979 ("the '979 Patent"), entitled *Transactional Security Over a Network*. The '979 Patent issued from a continuation of the application that led to the '713 Patent. A true and correct copy of the '979 Patent is attached as Exhibit B.

20.     On September 4, 2012, the USPTO duly and legally issued U.S. Patent No. 8,260,723 ("the '723 Patent"), entitled *Transactional Security Over a Network*. The '723 Patent is a member of the same patent family as the '713 and '979 Patents. A true and correct copy of the '723 Patent is attached as Exhibit C.

21.     The '713, '979, and '723 Patents were issued after a full and fair examination by the USPTO. The Patents-in-Suit were valid and in full force and effect during the periods relevant to this action.

22.     The Patents-in-Suit disclose novel systems and methods for conducting secure electronic transactions by using device and user identifiers to generate encrypted authorization requests.

23. Benedor is the owner of the entire right, title, and interest in the Patents-in-Suit, including the right to recover for past damages. Benedor has never authorized Google to practice any of its patents.

### D. Google's Infringing Activities and the Accused Instrumentality

24. At all times relevant to damages in this case, Google has made, used, sold, and offered for sale in the United States its mobile payment service, Google Pay (which was rebranded and consolidated as Google Wallet in 2022), which Google develops, distributes, and supports (collectively, the "Accused Service").

25. Google also designs, makes, uses, sells, offers for sale, and imports into the United States the Google Pixel line of smartphones (including Pixel 3 and later models) and the Pixel Watch, which Google ships with the Accused Service pre-installed, integrated with Google-authored Android operating-system software and Google-designed hardware security components. The Accused Service, together with the Google Pixel line and Google's Android operating system, and Google's supporting tokenization, attestation, and Token Service Provider infrastructure, are collectively referred to herein as the "Accused Instrumentality." Google's Google Wallet application is publicly distributed by Google through the Google Play Store as the Android application package com.google.android.apps.walletnfcrel.

26. Google has also exported all or a substantial portion of the components of the patented inventions for combination abroad.

27. The Accused Instrumentality, operating on Google-supplied hardware and in conjunction with Google's supporting systems, practices the inventions of the Patents-in-Suit and did so at all times relevant to damages in this case.

28.    Google publicly describes, in its own technical materials, that the Accused Instrumentality performs the following operations, which together practice at least one claim of each of the Patents-in-Suit, and did so during the damages period:

29.    **Device-unlock authentication (password entry and validation).** Google Wallet requires the user to authenticate by presenting a device-unlock credential (including a PIN or a password) through the Android lock-screen graphical user interface before Google Wallet will release a payment credential to make a purchase. Google publicly describes this requirement in its Google Wallet Help article, *Verify It's You to Make a Purchase*, Google Wallet Help, https://support.google.com/wallet/answer/12059519 (last visited Apr. 28, 2026). The Android framework validates the entered credential through Gatekeeper and BiometricPrompt and only releases user-authentication-bound Keystore keys (i.e., cryptographic keys stored in Android's secure key vault that the device will unlock and make available only after the user has just successfully entered a valid credential) upon a successful match. *Android Keystore System*, Android Developers, https://developer.android.com/privacy-and-security/keystore (last visited Apr. 28, 2026); *Gatekeeper*, Android Source, https://source.android.com/docs/security/features/authentication/gatekeeper (last visited April 27, 2026).

30.    **Reading and validating a hardware identifier from hardware.** Upon successful user authentication, Google's Wallet/TapAndPay payment infrastructure — including the Host Card Emulation (HCE) payment applet that emulates a contactless payment card when the phone is tapped against a reader — obtains and uses device-bound cryptographic key material (secret keys that are tied to, and usable only on, that specific device), including "Limited Use Keys" (also referred to as "Payment Token Keys"). Google's Token Service Provider

("TSP," the back-end service that issues and manages the per-device payment tokens) previously provisioned those keys into the device's hardware-backed Keystore — a secure storage area implemented either in the phone's Trusted Execution Environment (a protected processor mode isolated from the main operating system) or in a StrongBox Secure Element (a dedicated, tamper-resistant security chip). Google publicly identifies its "[s]ecure in-memory storage of limited-use keys (LUKs)" as a core security feature, explaining that the cardholder's "mobile device stores the primary key that generates transaction cryptograms for contactless transactions" and that "[n]o other primary key data is stored on the device." *Security*, Device Tokenization Developer Site, Google for Developers, https://developers.google.com/pay/issuers/overview/security (last visited Apr. 28, 2026). StrongBox-backed keys on Google Pixel 3 and later are physically stored and used inside Google's custom-designed Titan M security chip (succeeded by Titan M2 in Google Pixel 6 and later). Google has publicly confirmed these design choices and their application to mobile payments. Xiaowen Xin, *Titan M makes Pixel 3 our most secure phone yet* (Oct. 17, 2018), https://blog.google/products-and-platforms/devices/pixel/titan-m-makes-pixel-3-our-most-secure-phone-yet/ ("With Android 9, apps can now take advantage of StrongBox KeyStore APIs to generate and store their private keys in Titan M. The Google Pay team is actively testing out these new APIs to secure transactions."). Validity of the hardware identifier is checked in two places — on the device and in Google's back-end systems. Internally, the device checks that the required Keystore key is present, has not expired, and is properly bound to a recent user authentication. Externally, Google's TSP and the payment network verify the device's Android Key Attestation certificate chain — the chain of digital signatures proving the key was generated inside genuine Google-approved hardware — against Google's attestation root key at

provisioning time, and then verify the resulting transaction cryptogram at transaction time. *See* *Verify Hardware-Backed Key Pairs with Key Attestation*, Android Developers, https://developer.android.com/privacy-and-security/security-key-attestation (last visited Apr. 28, 2026); *Key and ID Attestation*, Android Open Source Project, https://source.android.com/docs/security/features/keystore/attestation (last visited Apr. 28, 2026). Google's published Google Wallet application code itself includes capabilities for reading what Google denominates a "stable hardware ID" for the device, and for performing on-device validity operations including obtaining the device's "last attestation result" and an "integrity token" for payment operations.

31. **Retrieving a user identifier from storage media.** Upon successful authentication and hardware-identifier validity, Google Wallet retrieves a Device Primary Account Number ("DPAN," also called a "device token" or "Device Account Number") from the device's tokenized credential storage (the on-device area that holds the payment token — a substitute card number — in place of the customer's real card number). The DPAN is a per-device, per-card token that Google's TSP integration previously provisioned and stored on the device. Google describes the DPAN in Jennifer Chang, *How Device Tokens Keep Your Payment Cards Safe in Google Wallet*, Google: The Keyword, https://blog.google/products/google-pay/device-tokens-google-wallet/ (last visited Apr. 28, 2026), and in its developer materials, *Security*, Device Tokenization Developer Site, Google for Developers, https://developers.google.com/pay/issuers/overview/security (last visited Apr. 28, 2026). The DPAN is provisioned under an agreement among the user, the card issuer, and Google (together with its TSP partner, who collectively act as the claimed "verification entity"), and the DPAN is the on-device identifier of that agreement.

32. **Maintaining a count value / sequencer on the device.** Google Wallet/TapAndPay payment infrastructure includes an HCE payment applet, which maintains an Application Transaction Counter ("ATC") that is incremented for each contactless transaction and serves as an input to the dynamic payment cryptogram (the encrypted, single-use code the device generates for each transaction; described in detail in the next paragraph). The use of the ATC is standard in EMVCo tokenization, as described in the U.S. Payments Forum, *EMV Payment Tokenization Primer and Lessons Learned* (June 2019), https://www.uspaymentsforum.org/wp-content/uploads/2019/06/EMV-Payment-Tokenization-Primer-Lessons-Learned-FINAL-June-2019.pdf, and is specifically documented in connection with Google Pay's HCE implementation in, e.g., *First Contact: Attacks on Google Pay, Samsung Pay, and Apple Pay*, HackMag, https://hackmag.com/security/pay-systems-attacks (last visited Apr. 28, 2026).

33. **Creating the encrypted user code (dynamic cryptogram).** For each transaction, Google's HCE payment applet generates an EMVCo dynamic cryptogram — a one-time, transaction-specific encrypted code, valid only for that single payment — ("Application Request Cryptogram" or "ARQC") by performing a keyed cryptographic operation whose inputs include (i) the DPAN, (ii) the device-bound Limited Use Key, (iii) the ATC, and (iv) transaction data. Google's own materials confirm that the cardholder's mobile device "stores the primary key that generates transaction cryptograms for contactless transactions." *Security*, Device Tokenization Developer Site, Google for Developers, https://developers.google.com/pay/issuers/overview/security (last visited Apr. 28, 2026). Industry technical analyses further describe Google Pay's "Dynamic Cryptogram" as "a combination of details required for payment authorisation, including the Payment Token (DPAN), Payment

Token Key, and Transaction Amount." Jas Shah, *Under the Hood — How Google Pay Works*, Fintech: Under the Hood (Substack) (Mar. 7, 2025), https://jasshah.substack.com/p/under-the-hood-how-googlepay-works. See also U.S. Payments Forum, *EMV Payment Tokenization Primer and Lessons Learned* 41 (June 2019), https://www.uspaymentsforum.org/wp-content/uploads/2019/06/EMV-Payment-Tokenization-Primer-Lessons-Learned-FINAL-June-2019.pdf (defining the "Token Cryptogram" as "[a] cryptogram, containing a transaction-unique value, typically generated using the payment token, payment-token-related data, and transaction data," and explaining that Host Card Emulation wallet providers use "limited use token keys" that "generate cryptograms that are passed with the EMV payment token for each transaction"). Google's published Google Wallet application code itself exposes — for the issuer-facing per-transaction payment-credentials generation step — a service Google denominates the "Generate Payment Credentials Service," bound by Google's published intent action com.google.android.gms.tapandpay.issuer.GENERATE_PAYMENT_CREDENTIALS. Each such cryptogram is bound to the specific transaction by the ATC, terminal unpredictable number, and amount, and is valid only for a single authorization request.

34.     **Transmitting the encrypted user code to a provider for an authorization decision.** For in-store tap-to-pay transactions, the device transmits the DPAN and cryptogram to the merchant point-of-sale terminal via NFC (Near Field Communication, the short-range wireless protocol used for contactless payments) using the HCE framework. For in-app and online transactions, the Google Pay API returns an encrypted PaymentData payload (the bundle of payment data being transmitted) carrying the DPAN and cryptogram to the merchant, as documented in *Payment Data Cryptography for Merchants*, Google Pay API for Android, https://developers.google.com/pay/api/android/guides/resources/payment-data-cryptography (last

visited Apr. 28, 2026). The merchant then routes the encrypted payload to its acquirer (the merchant's bank that processes its card transactions) and onward through the payment network to the TSP (for detokenization and cryptogram verification) and the card-issuing bank (the claimed "verification entity" acting together with the network and TSP) for an authorization decision, without ever exposing the customer's underlying Funding Primary Account Number ("FPAN") to the merchant.

35. **Receiving the authorization decision and performance of the transaction.** The merchant and payment network return an authorization result, which Google Wallet surfaces to the user through a confirmation UI (user interface — here, the on-screen confirmation shown in the Google Wallet app after the tap), and the merchant performs the transaction (e.g., completes the sale of goods or services).

36. On Google Pixel smartphones running Google Wallet, Google itself supplies every material component required to perform the methods of the Patents-in-Suit, and all such components reside on a single non-transitory computer-readable storage medium provisioned by Google. Specifically: (a) Google designs, manufactures the security-critical components of (including the Titan M and Titan M2 security chips), assembles, markets, sells, and offers for sale the Google Pixel line of smartphones; (b) Google develops, authors, and ships on Google Pixel devices the Android operating system, including the lock-screen, Gatekeeper, BiometricPrompt, Keystore, and StrongBox software components that execute the password-entry, password-validity, and hardware-identifier-validity steps; (c) Google develops, authors, and pre-installs on Google Pixel devices the Google Wallet application — distributed as a single Android application package, com.google.android.apps.walletnfcrel, on a single non-transitory storage medium (the device's flash) — together with the Wallet/TapAndPay payment

infrastructure that executes the hardware-identifier read, user-agreement-identifier retrieval, encrypted-user-code creation, transmission, and authorization-receipt steps; and (d) Google owns the Google-rooted attestation key infrastructure that validates Google Pixel devices as permitted hardware. Google announced and publicly confirmed its custom design and manufacture of the Titan M security chip in Xiaowen Xin, *Titan M Makes Pixel 3 Our Most Secure Phone Yet*, Google: The Keyword (Oct. 2018), https://blog.google/products/pixel/titan-m-makes-pixel-3-our-most-secure-phone-yet/, and in its contemporaneous Android Developers Blog post, *Building a Titan: Better Security Through a Tiny Chip*, Android Developers Blog (Oct. 2018), https://android-developers.googleblog.com/2018/10/building-titan-better-security-through.html, which expressly identified Google Pay as an application of the Titan M StrongBox APIs.

37. On information and belief, Google has had knowledge of the Patents-in-Suit, and of the '723 Patent in particular, since at least the dates described in the following paragraphs. Google is a sophisticated technology company with one of the largest patent portfolios in the United States and routinely monitors patent issuances in the fields of mobile payments, authentication, and tokenization. The Patents-in-Suit are publicly available through the USPTO.

38. Google's knowledge of the '723 Patent is further established by the face of Google's own patents. On information and belief, at least three United States patents owned by Google LLC cite U.S. Patent Application Publication No. 2008/0319914 A1 (Carrott), entitled "Transactional Security Over a Network" (the "'914 Publication"), as prior art on the face of the issued patent. The '914 Publication is the pre-issuance publication of U.S. Application No. 12/202,524, which is the application that issued on September 4, 2012 as the '723 Patent. The Google Patents database expressly identifies the '914 Publication as an "Other version" of U.S. Patent No. 8,260,723 B2.

39. The three Google-owned patents that cite the '914 Publication, and the dates on which Google's knowledge was at a minimum confirmed by the USPTO's issuance of each such patent, are:

40. U.S. Patent No. 9,870,556, entitled "Split Tender in a Prepaid Architecture," issued January 16, 2018, and assigned to Google LLC. The '914 Publication is cited as prior art on the face of the '556 Patent, identified as having been cited by the examiner during prosecution.

41. U.S. Patent No. 10,147,112, entitled "Delayed Processing Window in a Prepaid Architecture," issued December 4, 2018, and assigned to Google LLC. The '914 Publication is cited as prior art on the face of the '112 Patent. On information and belief, because the '914 Publication appears on the face of the '112 Patent without an examiner-cited designation, Google itself disclosed the '914 Publication to the USPTO in an Information Disclosure Statement submitted during prosecution of the '112 Patent, thereby demonstrating Google's actual knowledge of the '723 Patent family prior to the damages period in this case.

42. U.S. Patent No. 10,592,884, entitled "Split Tender in a Prepaid Architecture," issued March 17, 2020, and assigned to Google LLC. The '914 Publication is cited as prior art on the face of the '884 Patent, identified as having been cited by the examiner during prosecution.

43. Because the '914 Publication is the publication of the application that issued as the '723 Patent, each citation of the '914 Publication on the face of a Google-owned patent placed Google on notice of the '723 Patent, its specification, and the Carrott/Benedor patent family. Each such citation occurred after the '723 Patent had already issued on September 4, 2012, such that the substantive disclosure before Google during prosecution of the '556, '112, and '884 Patents was the same disclosure that had by then become the issued '723 Patent. The

earliest of these citations was of record no later than January 16, 2018, the issue date of the '556 Patent, which is before the relevant damages period in this action.

44. Google's awareness of the broader Carrott/Benedor patent portfolio is further demonstrated by citations of another Carrott/Benedor patent — U.S. Patent No. 6,782,369 (the "'369 Patent") — on the face of at least four additional Google-owned United States patents, namely U.S. Patent Nos. 7,827,062, 7,844,488, 7,930,207, and 8,676,644. Like the Patents-in-Suit, the '369 Patent is a Carrott invention owned by Benedor. While the '369 Patent itself is not asserted in this action, the repeated appearance of Carrott/Benedor patents as prior art on the face of Google's own patents, across multiple Google product lines and prosecution teams, establishes that Carrott and Benedor are familiar names within Google's patent awareness and that Google had ongoing, documented notice of the Carrott/Benedor patent portfolio well before and during the damages period in this action.

45. Further and independently, Google had actual pre-damages-period knowledge of Benedor's technology and the patents and patent applications protecting it, including U.S. Patent Application Publication No. 2008/0319914 A1, which later issued as the '723 Patent.

46. In January 2010, Benedor — then operating under the SecurePay trade name in connection with the commercial embodiment of the inventions claimed in the Patents-in-Suit (the "SecurePay System") — conducted a coordinated, multi-channel outreach to Google to pitch the SecurePay System and to seek an exclusive joint-venture partnership with Google.

47. Benedor's contacts into Google during this period included Google's legal department, specifically David C. Drummond (then Senior Vice President, Corporate Development and Chief Legal Officer), Kent Walker (then Vice President and General Counsel), David Lawee (then Vice President, Corporate Development), and Michelle Lee (Patents), and

Google's Operating Committee, specifically Jeff Huber (then Senior Vice President, Engineering) and Omid Kordestani (then Senior Advisor, Office of the CEO and Founders).

48. On or about January 19, 2010, Benedor external consultant Billy White sent Mr. Kordestani a written pitch describing the SecurePay System as "a major step forward in electronic payments via mobile phones and computers" that "offers complete security and protects the user from identity theft by eliminating the exchange of personal banking information over the internet," identifying Richard F. Carrott (the named inventor of the Patents-in-Suit) as SecurePay's inventor and CEO seeking an exclusive joint-venture partner, and noting that Google's legal department and Jeff Huber had already been apprised of the SecurePay System.

49. A true and correct copy of Mr. White's January 19, 2010 email to Mr. Kordestani is attached as Exhibit D-2. Mr. White's separate same-day email confirming that he had coordinated the pitch with Mr. Kordestani's administrator at Google in advance of sending it is attached as Exhibit D-1. A true and correct copy of Mr. Carrott's January 25, 2010 memorandum confirming Benedor's Google legal-department and Operating-Committee contacts by name is attached as Exhibit D-3.

50. Benedor's communications with Google during this period made clear that the SecurePay System was the subject of multiple issued U.S. patents and pending U.S. patent applications owned by Benedor, which at that time included the '914 Publication that had published on December 25, 2008 and that later issued as the '723 Patent.

51. Despite being presented with the patented SecurePay opportunity, Google did not enter into a license or joint venture with Benedor.

52. Google derives substantial revenue and strategic benefit from the Accused Instrumentality. Google charges merchants, issuing banks, and payment networks fees and/or

receives other consideration in connection with transactions conducted through the Accused Service. Further, the availability and security of Google Pay / Google Wallet are key selling features that drive sales of Google's high-margin Pixel hardware products, increase customer loyalty, and expand the reach of Google's ecosystem. These benefits are directly attributable to the infringing authentication and transaction authorization features of the Accused Instrumentality.

53. On information and belief, tens of millions of users in the United States engage with the infringing features of the Accused Instrumentality to complete transactions. These features are technically necessary for Google Pay / Google Wallet to function, such that the revenue and strategic benefits identified above could not have been realized absent the accused authentication and authorization flows.

### E. Google's Extraterritorial Infringement Under 35 U.S.C. § 271(f)

54. On information and belief, Google develops, controls, and supplies the software components of the Accused Instrumentality, including but not limited to the Android operating system, the Google Wallet / Google Pay application, the Wallet/TapAndPay payment infrastructure (including its Host Card Emulation interaction), and the specific code that implements the tokenization, cryptogram generation, and authorization flows, from its facilities within the United States, including its Mountain View, California headquarters.

55. Google supplies or causes to be supplied these software components from the United States to be installed and combined with hardware components (e.g., Google Pixel smartphones, Pixel Watch, and other Android devices) located outside the United States. This supply occurs, for example, when users abroad download or update the Google Wallet / Google Pay application and associated Android system software that includes the accused functionality.

56.     These software components are material components of the inventions claimed in the '713 and '723 Patents, including the non-transitory computer-readable medium claims (e.g., Claim 7 of the '723 Patent). The software contains the instructions that, when combined with the device hardware, practice the patented methods.

57.     Pursuant to 35 U.S.C. § 271(f)(1), Google supplies from the United States all or a substantial portion of the components of the inventions claimed in the '713 and '723 Patents. Google actively induces the combination of these software components with hardware outside the United States in a manner that would infringe the '713 and '723 Patents if such combination occurred within the United States. Google's inducement includes marketing the Accused Service to a global audience and providing instructions for its use on devices located abroad.

58.     Pursuant to 35 U.S.C. § 271(f)(2), Google supplies from the United States a key component of the inventions claimed in the '713 and '723 Patents — masters of the software code that implements the Google Pay / Google Wallet secure transaction process. This component is especially made and adapted for use in the infringing Accused Instrumentality and is not a staple article of commerce suitable for substantial non-infringing use. On information and belief, Google knows this component is so made and adapted and intends for it to be combined with hardware outside the United States to practice the patented inventions.

### III.     COUNT I: INFRINGEMENT OF THE '979 PATENT

59.     Benedor incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

60.     Google has directly infringed one or more claims of the '979 Patent, literally and/or under the doctrine of equivalents, by making, using, selling, and/or offering to sell the Accused Instrumentality in the United States, in violation of 35 U.S.C. § 271(a).

61.     For example, during the relevant damages period, the Accused Instrumentality practiced every step of the method of at least Claim 1 of the '979 Patent. When a user initiates a transaction with Google Pay or Google Wallet, the system, as described above and in Google's own technical materials cited herein:

    a.   receives a user-entered password (e.g., a device passcode or PIN) via the Android lock-screen graphical user interface (GUI);

    b.   determines if the entered credential is valid by checking it against a credential stored on the device through the Android Gatekeeper framework;

    c.   after validation, reads a device-specific hardware identifier from the device's secure hardware (e.g., a unique cryptographic key or Limited Use Key from the hardware-backed Keystore, including the Titan M / Titan M2 StrongBox Secure Element on Google Pixel devices);

    d.   determines if the hardware identifier is valid (both internally, through Keystore enforcement of user-authentication binding and applet-level validity checks, and externally, through Android Key Attestation and Google's Token Service Provider infrastructure at provisioning and transaction time);

    e.   retrieves a user identifier corresponding to the user's payment account (i.e., the Device Primary Account Number, or DPAN) from the device's tokenized credential storage;

f. creates an encrypted user code (i.e., a dynamic EMVCo cryptogram) that is derived from both the DPAN (user identifier) and the device-bound Limited Use Key (hardware identifier); and

g. transmits the encrypted user code to a provider (e.g., the merchant and the payment network, with the card-issuing bank acting as verification entity) to request transaction authorization, and receives the authorization decision from the provider.

62. To the extent any step or steps of the patented method are performed by a user of the Accused Instrumentality, Google is liable as a vicarious direct infringer because Google conditions participation in an activity or receipt of a benefit upon performance of a step or steps of a patented method and establishes the manner or timing of that performance. Specifically, Google conditions the benefit of making a secure mobile payment on the user performing certain essential steps of the patented method. Google establishes the manner and timing of these steps through its design of the Android operating system, the Google Wallet / Google Pay application, and — for Google Pixel devices — the physical hardware of its devices, including the Titan M / Titan M2 security chip.

63. Google has also indirectly infringed the '979 Patent by inducing infringement under 35 U.S.C. § 271(b). Google has actively and knowingly encouraged and instructed its customers to use the Accused Instrumentality in a manner that directly infringes the '979 Patent.

64. Google has also indirectly infringed the '979 Patent by contributing to infringement under 35 U.S.C. § 271(c). Google provides the Accused Service and its integrated hardware (including Google Pixel smartphones), which are material components of the patented

invention, knowing them to be specially made and adapted for use in an infringing manner. These components are not staple articles of commerce suitable for substantial non-infringing use.

65. Google's infringement of the '979 Patent has been willful, wanton, and deliberate.

66. As a direct and proximate result of Google's infringement, Benedor has been irreparably harmed and has suffered damages.

## IV. COUNT II: INFRINGEMENT OF THE '713 PATENT

67. Benedor incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

68. Google has directly infringed one or more claims of the '713 Patent, literally and/or under the doctrine of equivalents, by making, using, selling, and/or offering to sell the Accused Instrumentality in the United States, in violation of 35 U.S.C. § 271(a), and, as to the non-transitory computer-readable medium claims of the '713 Patent, by supplying a substantial portion of the components of the invention from the United States for combination abroad, in violation of 35 U.S.C. § 271(f).

69. For example, during the relevant damages period, the Accused Instrumentality practiced every step of, and embodied every limitation of, at least Claim 13 of the '713 Patent when performing a secure transaction authorization. Specifically, the Google Pay / Google Wallet system, as described above and documented in Google's own technical materials cited herein, performed the following steps:

70. Receiving an entered password from a user via a graphical user interface: Google Wallet requires the user to authenticate via the Android lock-screen GUI by entering a credential such as a PIN or password. See *Verify It's You to Make a Purchase*, Google Wallet Help, https://support.google.com/wallet/answer/12059519 (last visited Apr. 28, 2026).

71.     Determining if the entered password is valid: The Android framework (including Gatekeeper and BiometricPrompt) validates the entered credential against the credential stored on the device; only a successful match unlocks user-authentication-bound Keystore keys, and if the credential is not valid, the transaction is blocked. See *Android Keystore System*, Android Developers, https://developer.android.com/privacy-and-security/keystore (last visited Apr. 28, 2026).

72.     Based on a valid password, reading a hardware identifier from the user's device: Upon successful user authentication, the Google Wallet Host Card Emulation payment applet accesses a unique, device-specific cryptographic key (the Limited Use Key) provisioned within the device's hardware-backed Keystore. On Google Pixel 3 and later, the key is stored and used inside Google's Titan M StrongBox Secure Element; on Pixel 6 and later, in Titan M2. See Xiaowen Xin, *Titan M Makes Pixel 3 Our Most Secure Phone Yet*, Google: The Keyword (Oct. 2018), https://blog.google/products/pixel/titan-m-makes-pixel-3-our-most-secure-phone-yet/; *Building a Titan: Better Security Through a Tiny Chip*, Android Developers Blog (Oct. 2018), https://android-developers.googleblog.com/2018/10/building-titan-better-security-through.html. This key comprises a hardware identifier.

73.     Determining if the hardware identifier is valid: The Accused Instrumentality validates the hardware identifier both internally (through Android Keystore enforcement and Host Card Emulation applet-level checks of the Limited Use Key's presence, non-expiration, and user-authentication binding) and externally (through Google's Android Key Attestation root validation at provisioning and through the TSP's and payment network's verification of the transaction cryptogram). See *Verify Hardware-Backed Key Pairs with Key Attestation*, Android Developers, https://developer.android.com/privacy-and-security/security-key-attestation (last

visited Apr. 28, 2026); *Security*, Device Tokenization Developer Site, Google for Developers, https://developers.google.com/pay/issuers/overview/security (last visited Apr. 28, 2026).

74. Based on a valid hardware identifier, retrieving a user agreement identifier: After device validation, the Google Wallet client retrieves the Device Primary Account Number (DPAN) from tokenized credential storage (the on-device area that holds the payment token — a substitute card number — in place of the customer's real card number). The DPAN is a tokenized representation of the user's payment card, provisioned under an agreement among the user, the card issuer, and Google together with its Token Service Provider partner (collectively, the "verification entity"), and comprises a user agreement identifier. See *How Device Tokens Keep Your Payment Cards Safe in Google Wallet*, Google: The Keyword, https://blog.google/products/google-pay/device-tokens-google-wallet/ (last visited Apr. 28, 2026); *Security*, Device Tokenization Developer Site, Google for Developers, https://developers.google.com/pay/issuers/overview/security (last visited Apr. 28, 2026).

75. Creating an encrypted user code by encrypting the user agreement identifier and the hardware identifier, each said encrypted code being valid only for a single request for an authorization decision: The Google Wallet HCE applet generates a dynamic, transaction-specific EMVCo cryptogram ("ARQC") by performing a keyed cryptographic operation whose inputs include the DPAN (user agreement identifier) and the device-bound Limited Use Key (hardware identifier), together with transaction data. Google's own technical materials confirm that the cardholder's mobile device "stores the primary key that generates transaction cryptograms for contactless transactions." *Security*, Device Tokenization Developer Site, Google for Developers, https://developers.google.com/pay/issuers/overview/security (last visited Apr. 28, 2026). Industry technical analyses further describe Google Pay's "Dynamic Cryptogram" as "a combination of

details required for payment authorization, including the Payment Token (DPAN), Payment Token Key, and Transaction Amount." Jas Shah, *Under the Hood — How Google Pay Works*, Fintech: Under the Hood (Substack) (Mar. 7, 2025), https://jasshah.substack.com/p/under-the-hood-how-googlepay-works. See also U.S. Payments Forum, *EMV Payment Tokenization Primer and Lessons Learned* 41 (June 2019), https://www.uspaymentsforum.org/wp-content/uploads/2019/06/EMV-Payment-Tokenization-Primer-Lessons-Learned-FINAL-June-2019.pdf (defining the "Token Cryptogram" as "[a] cryptogram, containing a transaction-unique value, typically generated using the payment token, payment-token-related data, and transaction data," and explaining that Host Card Emulation wallet providers use "limited use token keys" that "generate cryptograms that are passed with the EMV payment token for each transaction"). Google's published Google Wallet application code itself exposes — for the issuer-facing per-transaction payment-credentials generation step — a service Google denominates the "Generate Payment Credentials Service," bound by Google's published intent action com.google.android.gms.tapandpay.issuer.GENERATE_PAYMENT_CREDENTIALS. Each cryptogram is bound to the specific transaction by the Application Transaction Counter, terminal unpredictable number, and amount, so that it is valid only for a single authorization request.

76. Transmitting the encrypted user code to a provider in a request for an authorization decision: The encrypted user code (the DPAN plus the dynamic cryptogram) is transmitted via NFC to the merchant terminal through the Host Card Emulation framework for in-store purchases, or as an encrypted PaymentData payload through the Google Pay API for in-app and online purchases, and is then routed through the acquirer and the payment network to the Token Service Provider for detokenization and cryptogram verification and to the card-issuing bank (verification entity) for an authorization decision. See *Payment Data Cryptography for*

*Merchants*, Google Pay API for Android, https://developers.google.com/pay/api/android/guides/resources/payment-data-cryptography (last visited Apr. 28, 2026).

77.     To the extent any step or steps of the patented method are performed by a user of the Accused Instrumentality, Google is liable as a vicarious direct infringer because Google conditions participation in an activity or receipt of a benefit upon performance of a step or steps of a patented method and establishes the manner or timing of that performance. Specifically, Google conditions the benefit of making a secure mobile payment on the user performing certain essential steps of the patented method. Google establishes the manner and timing of these steps through its design of the Android operating system, the Google Wallet / Google Pay application, and — for Google Pixel devices — the physical hardware of its devices, including the Titan M / Titan M2 security chip.

78.     Google has also indirectly infringed the '713 Patent by inducing infringement under 35 U.S.C. § 271(b) and by contributing to infringement under 35 U.S.C. § 271(c), for the reasons set forth above. Further, as to the non-transitory computer-readable medium claims of the '713 Patent, Google has infringed under 35 U.S.C. § 271(f) by supplying the software — the instructions stored on the non-transitory computer-readable medium — from the United States for combination with devices located outside the United States, as detailed above.

79.     Google's infringement of the '713 Patent was willful, wanton, and deliberate.

80.     As a direct and proximate result of Google's infringement, Benedor has been irreparably harmed and has suffered damages.

**V.      COUNT III: INFRINGEMENT OF THE '723 PATENT**

81.     Benedor incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

82. Google has directly infringed one or more claims of the '723 Patent, literally and/or under the doctrine of equivalents, by making, using, selling, and/or offering to sell the Accused Instrumentality in the United States, in violation of 35 U.S.C. § 271(a), and, as to Claim 7 of the '723 Patent (which is a non-transitory computer-readable medium claim), by supplying a substantial portion of the components of the invention from the United States for combination abroad, in violation of 35 U.S.C. § 271(f).

83. For example, during the relevant damages period, the Accused Instrumentality practiced every step of, and embodied every limitation of, at least Claim 1 of the '723 Patent. When performing a secure transaction, the Google Pay / Google Wallet system, as described above and documented in Google's own technical materials cited herein, performed the following steps:

84. Receiving a password from a customer into a graphic user interface: Google Wallet requires the user to authenticate via the Android lock-screen GUI by entering a credential such as a PIN or password to authorize a payment. See *Verify It's You to Make a Purchase*, Google Wallet Help, https://support.google.com/wallet/answer/12059519 (last visited Apr. 28, 2026).

85. Determining whether said password is valid: The Android Gatekeeper / BiometricPrompt processor, executing on the device, validates the entered credential against the credential stored securely on the device. The transaction cannot proceed unless the credential is determined to be valid. See *Android Keystore System*, Android Developers, https://developer.android.com/privacy-and-security/keystore (last visited Apr. 28, 2026).

86. Reading a plurality of hardware identifiers comprising at least a portion of a serial number of at least one hardware component: Upon valid password entry, the Accused

Instrumentality invokes cryptographic keys — including Limited Use Keys — that are uniquely provisioned to the device's hardware-backed Keystore and, on Google Pixel 3 and later, to Google's custom-designed Titan M (and, on Pixel 6 and later, Titan M2) StrongBox Secure Element. These keys are persistent, unique hardware identifiers for the security hardware component and include attestation material, provisioned at Google's manufacture, that chains to Google-held attestation root keys. See Xiaowen Xin, *Titan M Makes Pixel 3 Our Most Secure Phone Yet*, Google: The Keyword (Oct. 2018), https://blog.google/products/pixel/titan-m-makes-pixel-3-our-most-secure-phone-yet/; *Building a Titan: Better Security Through a Tiny Chip*, Android Developers Blog (Oct. 2018), https://android-developers.googleblog.com/2018/10/building-titan-better-security-through.html; *Key and ID Attestation*, Android Open Source Project, https://source.android.com/docs/security/features/keystore/attestation (last visited Apr. 28, 2026). The hardware identifiers thus constitute serial numbers within the meaning of the claim, either literally or under the doctrine of equivalents.

87. Determining whether said plurality of hardware identifiers are valid by comparing said read hardware identifiers with a list of permitted hardware identifiers: The Accused Instrumentality validates the hardware identifiers through cryptographic checks, including Android Key Attestation at provisioning time (in which the attestation certificate chain is validated against Google's published attestation root key, i.e., a list of permitted hardware identifiers maintained by Google), and through the Token Service Provider's and payment network's verification of the resulting transaction cryptogram against the record of Limited Use Keys previously provisioned to that device. See *Verify Hardware-Backed Key Pairs with Key Attestation*, Android Developers, https://developer.android.com/privacy-and-security/security-

key-attestation (last visited Apr. 28, 2026); *Security*, Device Tokenization Developer Site, Google for Developers, https://developers.google.com/pay/issuers/overview/security (last visited Apr. 28, 2026).

88. Retrieving a customer identifier string from a storage media: Upon successful validation of the user and device, Google Wallet retrieves the Device Primary Account Number (DPAN) from its secure on-device storage. The DPAN is a token that represents the customer's account and comprises a customer identifier string. See *How Device Tokens Keep Your Payment Cards Safe in Google Wallet*, Google: The Keyword, https://blog.google/products/google-pay/device-tokens-google-wallet/ (last visited Apr. 28, 2026).

89. Updating a count value by incrementing a sequencer (e.g., a running counter that advances by one with each transaction): The Google Wallet Host Card Emulation payment applet maintains and increments an Application Transaction Counter ("ATC") for each transaction to generate a unique cryptogram. The ATC is an example of the claimed "sequencer."

90. Creating an encrypted customer code by encrypting said customer identifier string, said plurality of hardware identifiers, and said count value: The Google Wallet HCE applet generates a dynamic payment cryptogram ("ARQC") by performing a cryptographic operation that uses as inputs the DPAN (customer identifier string), the ATC (count value), and the device's Limited Use Key (hardware identifier). The resulting cryptogram is an encrypted customer code created from these inputs.

91. Transmitting said encrypted customer code to a merchant instead of customer credit card information: The device transmits the encrypted customer code, comprising the DPAN and the dynamic cryptogram, to the merchant's system via NFC (for in-store transactions) or via the Google Pay API (for in-app and online transactions). The customer's actual credit card

number (FPAN) is not transmitted to the merchant. See *Payment Data Cryptography for Merchants*, Google Pay API for Android, https://developers.google.com/pay/api/android/guides/resources/payment-data-cryptography (last visited Apr. 28, 2026).

92. Receiving an authorization for said purchase transaction from said merchant by said electronic device: After the merchant's system receives an authorization decision from the payment network, it sends a confirmation signal back to the customer's device. The device receives this confirmation and displays a success message (e.g., a check-mark or equivalent), thereby receiving the authorization from the merchant.

93. To the extent any of the foregoing steps are not found to be literally infringing, they infringe under the doctrine of equivalents as they perform substantially the same function in substantially the same way to achieve substantially the same result.

94. To the extent any step or steps of the patented method are performed by a user of the Accused Instrumentality, Google is liable as a vicarious direct infringer because Google conditions participation in an activity or receipt of a benefit upon performance of a step or steps of a patented method and establishes the manner or timing of that performance. Specifically, Google conditions the benefit of making a secure mobile payment on the user performing certain essential steps of the patented method. Google establishes the manner and timing of these steps through its design of the Android operating system, the Google Wallet / Google Pay application, and — for Google Pixel devices — the physical hardware of its devices, including the Titan M / Titan M2 security chip.

95. Google has also indirectly infringed the '723 Patent by inducing infringement under 35 U.S.C. § 271(b) and by contributing to infringement under 35 U.S.C. § 271(c), for the

reasons set forth above. Further, Google has infringed under 35 U.S.C. § 271(f) by supplying the software that performs these steps — including the instructions stored on the non-transitory computer-readable medium of Claim 7 of the '723 Patent — from the United States for combination with devices located outside the United States, as detailed above.

96. Google's infringement of the '723 Patent was willful, wanton, and deliberate.

97. As a direct and proximate result of Google's infringement, Benedor has been irreparably harmed and has suffered damages.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff BenedorTSE, LLC respectfully requests that this Court enter judgment in its favor and against Defendant Google LLC, and grant the following relief:

A. A judgment that Google has infringed one or more claims of the '979 Patent, the '713 Patent, and the '723 Patent;

B. A declaratory judgment that the '979 Patent, the '713 Patent, and the '723 Patent were valid and in force throughout the damages period and are enforceable;

C. An award of damages adequate to compensate Benedor for Google's infringement, in an amount to be proven at trial, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the Court under 35 U.S.C. § 284;

D. A judgment that Google's infringement has been willful, and an order enhancing the damages award up to three times the amount found or assessed, pursuant to 35 U.S.C. § 284;

E. A judgment that this case is exceptional and an award to Benedor of its reasonable attorneys' fees, pursuant to 35 U.S.C. § 285;

F.  An award of pre-judgment and post-judgment interest on the damages awarded;

and

G.  Such other and further relief as the Court may deem just and proper.

## VII.  JURY DEMAND

Plaintiff BenedorTSE, LLC hereby demands a trial by jury on all issues so triable.

Dated: April 30, 2026

Respectfully submitted,

*/s/ W. David Bridgers*

W. David Bridgers (TN BPR #16603)
Chanelle Acheson (TN BPR #30008)
G. Edward Powell III (CA Bar #324530)
Ira C. Waddey (TN BPR #2665)
**Waddey Acheson LLC**
1030 16th Ave South, Suite 300
Nashville, TN 37212
615-839-1100
Counsel for Plaintiff BenedorTSE, LLC